Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL X

| EL PUEBLO DE PUERTO RICO *Apelado* v. MARIO I. ORTIZ RIVERA *Apelante* | KLAN202301161 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Ponce Crim. Núm.: JLE2023G0178 Sobre: Art. 4(B) Ley 284-1999 |
|---|---|---|

Panel integrado por su presidenta, la Juez Lebrón Nieves, la Juez Barresi Ramos y la Jueza Santiago Calderón

Santiago Calderón, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 3 de julio de 2025.

Comparece ante nos, el señor Mario Ismael Ortiz Rivera (señor Ortiz o apelante) y nos solicita que revoquemos la *Sentencia*[1] dictada el 5 de diciembre de 2023 y notificada el 28 de diciembre de 2023, por el Tribunal de Primera Instancia, Sala Superior de Ponce (TPI o foro apelado). Mediante el referido dictamen, se declaró al apelante culpable y convicto por infringir el Artículo 4 (b) de la Ley Núm. 284 de 21 de agosto de 1999, según enmendada, conocida como "Ley Contra el Acecho en Puerto Rico"[2] (Ley Núm. 284-1999).

Por los fundamentos que expondremos a continuación, se **revoca** la *Sentencia* apelada.

**I.**

Según se desprende del recurso ante nos, por hechos ocurridos entre el 23 de febrero de 2023 al 9 de marzo de 2023, el Ministerio Público (Ministerio) presentó una *Denuncia*[3] contra el señor Ortiz por violación al Artículo 4(b) de la Ley Núm. 284-1999, *supra*. Específicamente, la *Denuncia* lee como sigue:

---

[1] Véase los autos originales, *Sentencia* dictada el 5 de diciembre de 2023.
[2] 33 LPRA sec. 4013 nota *et seq.*
[3] Véase los autos originales, *Denuncia* del 9 de marzo de 2023.

Número Identificador
SEN2025_____

El referido acusado, Mario Ortiz Rivera, entre la fecha 23 de febrero de 2023 al 9 de marzo de 2023, en Juana [Díaz], Puerto Rico, que forma parte de la jurisdicción del Tribunal Primera Instancia, Sala de Ponce, ilegal, voluntaria, maliciosa y criminalmente, violó la orden de acecho número: POL2842022-01902, expedida por la Honorable Juez Ginny Vélez Carrera, con vigencia del 24 de agosto de 2022 hasta el 24 de agosto de 2025, a favor de Alexis José Hernández Muñoz. Consistente en que el aquí acusado luego de haber sido notificado de dicha orden y mientras el perjudicado estaba en su residencia con su familia, el día 23 [de] febrero de 2023 a las 10:23 de la noche, le profirió las palabras obscenas: "canto de cabrón, mama bicho, me cago en la madre, te voy a explotar y le dijo ya tú vas a ver lo que va pasar mañana"; el 24 de febrero de 2023 a la 10:30 de la noche, el 3 de marzo de 2023 a las 9:07 de la noche y el 4 de marzo de 2023, a las 10:05 de la noche, le profirió las palabras "cabrón, me cago en tu madre, hijo de puta, huele bicho"; el 9 de marzo de 2023 a las 4:00 de la mañana, le profirió las palabras soeces: "canto de cabrón, mama bicho, me cago en tu madre, hijo de la gran puta, cabrón y le grito a él y a su familia: "como se atrevan a salir , los voy a explotar". Siendo esto un patrón de acecho constante y reiterado de violaciones a la orden de protección vigente que este tiene bajo la Ley 284, arriba indicada[4].

Ese mismo día, el foro apelado determinó causa probable y se citó al señor Ortiz a Vista Preliminar.

Habiéndose determinado causa probable en la Vista Preliminar, el 29 de junio de 2023, el Ministerio presentó una *Acusación*[5] contra el apelante.

Tras varios trámites procesales, el 12 de septiembre de 2023[6] y el 6 de octubre de 2023[7], se celebró el juicio contra el señor Ortiz por Tribunal de Derecho. El Ministerio presentó prueba testifical y documental para sostener el cargo imputado. Por un lado, la prueba testifical consistió en los testimonios vertidos bajo juramento de: (1) el Agente Carlos J. Alonso Cortés (Agte. Alonso), (2) el señor Alexis José Hernández Muñoz (señor Hernández Muñoz), (3) la señora Anabelle Muñoz Pagán (señora Muñoz), (4) el señor Alexis Hernández Ramos (señor Hernández Ramos) y (5) el Agente Raymundo Quiles Moreno (Agte. Quiles).

---

[4] *Íd.*
[5] Véase los autos originales, *Acusación* del 29 de junio de 2023.
[6] Véase los autos originales, *Minuta* del 12 de septiembre de 2023.
[7] Véase los autos originales, *Minuta* del 6 de octubre de 2023.

A continuación, resumiremos los aspectos relevantes de los testimonios de los testigos del Ministerio Público.

**<u>Agente Carlos J. Alonso Cortés</u>**

El desfile de la prueba comenzó con el testimonio del Agte. Alonso. Este declaró que laboraba en la división de Crímenes Cibernéticos de Ponce, en la sección de Evidencia Digital[8]. Luego de ser cualificado como perito de crímenes cibernéticos, explicó que su rol en el caso de autos consistió en extraer la evidencia del celular del señor Hernández Muñoz y grabarla en un disco compacto que, posteriormente, se le entregó al Agte. Quiles, quien era el agente investigador[9]. Según se desprendió del testimonio, el Agte. Alonso identificó el disco compacto con el número de querella, sus iniciales y la fecha[10]. Asimismo, indicó que el disco compacto contenía cuatro (4) videos que extrajo del *iPhone 1 Pro Max* del señor Hernández Muñoz, así como una grabación de pantalla, donde el Agte. Alonso autenticó su labor de extracción, para un total de cinco (5) videos[11].

En cuanto a la duración de los videos, el Agte. Alonso señaló que se limitó a lo que el señor Hernández Muñoz le presentó[12]. Con relación al contenido de los videos, el testigo declaró que desconocía si los mismos estaban en su totalidad, si fueron alterados o si fueron cortados, pues no revisó las cámaras de seguridad de la casa del señor Hernández Muñoz[13].

Finalmente, el Agte. Alonso reconoció que: (1) no sabía la procedencia de los videos, ni la fecha ni la hora en la cual se tomaron los mismos[14]; (2) no verificó las cámaras de seguridad de la residencia[15] y (3) que el señor Hernández Muñoz no le entregó las

---

[8] Transcripción *Vista Celebradas*, pág. 10, líneas 1-6.
[9] Transcripción *Vista Celebradas*, pág. 12, líneas 1-19.
[10] Transcripción *Vista Celebradas*, pág. 12, líneas 22-23.
[11] Transcripción *Vista Celebradas*, pág. 14, líneas 10-14 y pág. 19, líneas 15-31.
[12] Transcripción *Vista Celebradas*, pág. 18, líneas 1-3.
[13] Transcripción *Vista Celebradas*, pág. 18, líneas 3-15.
[14] Transcripción *Vista Celebradas*, pág. 24, líneas 13-20 y pág. 25, líneas 30-31.
[15] Transcripción *Vista Celebradas*, pág. 25, líneas 1-5.

cámaras de video, por lo que su rol se limitó a revisar el teléfono celular que recibió con evidencia[16].

### Alexis José Hernández Muñoz

El señor Hernández Muñoz declaró que vivía en el Barrio Piedra de Aguza en Juana Díaz junto a sus padres, la señora Muñoz y el señor Hernández Ramos[17]. Sostuvo que conocía al apelante porque era su vecino alrededor de treinta (30) años[18].

En cuanto a los hechos pertinentes a la controversia que nos ocupa, relató que, el 23 de febrero de 2023, se encontraba acostado en su cuarto y escuchó cuando el señor Ortiz profirió lo siguiente: "cabrón, mamabicho, me cago en tu madre. Como tú salgas ya tú vas a ver"[19]. Luego de escuchar las expresiones antes mencionadas, el señor Hernández Muñoz accedió a las cámaras a través de su *iPhone 11 Pro Max* y pudo observar que el apelante se dirigía al señor Hernández Ramos para insultarlo desde la verja[20].

El 24 de febrero de 2023, el testigo volvió a escuchar al apelante decir las mismas expresiones de "cabrón, mamabicho, me cago en tu madre, como tú salgas ya tú vas a ver"[21]. Al volver a escuchar las expresiones, el testigo se quedó en su cuarto, pero accedió a las cámaras para verificar y volvió a ver al señor Ortiz dirigiéndose donde el señor Hernández Ramos[22].

Días más tarde, el 3 de marzo de 2023, el señor Hernández Muñoz declaró que se encontraba sentado en el balcón de su residencia, viendo televisión y vio al apelante dirigiéndose hacia él y le dijo: "huele bicho, mamabicho, lo que tengas que decirme lo dice en la cara, canto e' cabrón. ¿Oíste, mamabicho?"[23]. Una vez más,

---

[16] Transcripción *Vista Celebradas*, pág. 26, líneas 3-16.
[17] Transcripción *Vista Celebradas*, pág. 28, líneas 15-18, 30-31 y pág. 29, líneas 1-2.
[18] Transcripción *Vista Celebradas*, pág. 28, líneas 19-24.
[19] Transcripción *Vista Celebradas*, pág. 29, líneas 5-13.
[20] Transcripción *Vista Celebradas*, pág. 29, líneas 13-14 y 27-31, pág. 30, líneas 1-4.
[21] Transcripción *Vista Celebradas*, pág. 31, líneas 5-8.
[22] Transcripción *Vista Celebradas*, pág. 31, líneas 9-15.
[23] Transcripción *Vista Celebradas*, pág. 31, líneas 16-21.

accedió a las cámaras que graban videos de movimiento 24/7 por la aplicación y extrajo el video y lo grabó en la galería de su celular[24].

En cuanto a lo sucedido el 4 de marzo de 2023, expuso que su papá, el señor Hernández Ramos, le manifestó que el apelante le profirió palabras soeces, por lo que accedió a las cámaras para corroborar[25].

Luego, el testigo indicó que el 9 de marzo de 2023, alrededor de las cuatro (4:00) de la mañana se encontraba en su residencia durmiendo y escuchó una voz diciendo: "mira canto de cabrón, como tú sigas jodiendo, ya tu vas a ver, no salgas pa' fuera porque los voy a explotar"[26]. Por lo que, procedió a extraer el video y al día siguiente, su mamá, la señora Muñoz, llamó a la policía para notificar lo sucedido debido a que existía una orden de protección vigente contra el señor Ortiz[27].

El testigo indicó que no tenía el video del 23 de febrero de 2023 y, por ende, no podía constatar que el señor Ortiz estuviera pegado a la verja dirigiéndose a su padre, el señor Hernández Ramos[28]. Asimismo, reconoció que el apelante, al emitir sus expresiones de "cabrón, mamabicho, me cago en tu madre, si sales te exploto", no mencionó el nombre de él, de su padre o de su madre[29]. Igualmente, admitió que no le constaba si el señor Ortiz estaba acompañado de alguien en la casa o si estaba hablando por teléfono[30].

En cuanto a los hechos ocurridos el 24 de febrero de 2023, el testigo indicó que ninguno de los videos presentados era de esa fecha[31]. Pertinente a los hechos del 4 de marzo de 2023, adujo que el video de la mencionada fecha no estaba disponible[32].

---

[24] Transcripción *Vista Celebradas*, pág. 31, líneas 21-30 y pág. 32, líneas 1-10.
[25] Transcripción *Vista Celebradas*, pág. 32, líneas 11-27.
[26] Transcripción *Vista Celebradas*, pág. 32, líneas 28-31 y pág. 33, línea 1.
[27] Transcripción *Vista Celebradas*, pág. 33, líneas 1-2 y 4-17.
[28] Transcripción *Vista Celebradas*, pág. 42, líneas 19-31 y pág., línea 1.
[29] Transcripción *Vista Celebradas*, pág. 43, líneas 6-17, pág. 67, líneas 28-29.
[30] Transcripción *Vista Celebradas*, pág. 68, líneas 9-14.
[31] Transcripción *Vista Celebradas*, pág. 46, líneas 27-29.
[32] Transcripción *Vista Celebradas*, pág. 69, líneas 29-30.

El señor Hernández Muñoz, también admitió que en ninguno de los videos que se mostraron salía el apelante señalándolo o mencionando su nombre[33].

Finalmente, el testigo indicó que extrajo los videos de la aplicación y se los entregó al Agte. Alonso como evidencia[34].

### Anabelle Muñoz Pagán

La señora Muñoz declaró que vivía en el Barrio Piedra de Aguza en Juana Díaz y que conocía al señor Ortiz por razón de que eran vecinos verja con verja[35]. Surge de su testimonio que, el 23 de febrero de 2023, la testigo escuchó al apelante gritar "Mamabichos, me cago en tu madre, cabrones. Te voy a explotar"[36]. Así pues, dado que tenían una orden de protección contra el apelante, la señora Muñoz procedió a llamar a la policía[37].

En cuanto a los hechos ocurridos el 24 de febrero de 2023[38], el 3 de marzo de 2023[39] y el 4 de marzo de 2023[40] la testigo indicó que el señor Ortiz profirió palabras soeces.

La testigo reconoció que se mantuvo en el interior de su residencia durante las fechas en que ocurrieron los hechos[41] y que no tenía conocimiento de lo que ocurría fuera de su residencia[42].

### Alexis Hernández Ramos

El señor Hernández Ramos declaró que vivía en el Barrio Piedra de Aguza en Juana Díaz junto a su esposa e hijo y que conocía al señor Ortiz por razón de que eran vecinos verja con verja[43].

---

[33] Transcripción *Vista Celebradas*, pág. 100, líneas 13-18.
[34] Transcripción *Vista Celebradas*, pág. 71, líneas 5-17.
[35] Transcripción *Vista Celebradas*, pág. 104, líneas 1-6.
[36] Transcripción *Vista Celebradas*, pág. 104, líneas 25-30 y pág. 105, líneas 1-3.
[37] Transcripción *Vista Celebradas*, pág. 105, líneas 21-31.
[38] Transcripción *Vista Celebradas*, pág. 109, líneas 19-29.
[39] Transcripción *Vista Celebradas*, pág. 110, líneas 19-27.
[40] Transcripción *Vista Celebradas*, pág. 112, líneas 6-7.
[41] Transcripción *Vista Celebradas*, pág. 140, líneas 14-19.
[42] Transcripción *Vista Celebradas*, pág. 140, líneas 20-22.
[43] Transcripción *Vista Celebradas*, pág. 146, líneas 2-13.

El testigo manifestó estar en su residencia los días 23 de febrero de 2023[44], 24 de febrero de 2023[45], 3 de marzo de 2023[46], 4 de marzo de 2023[47] y 9 de marzo de 2023[48] y escuchar al señor Ortiz proferir palabras soeces.

Finalmente, el señor Hernández Ramos aseguró que el apelante era el que estaba gritando palabras soeces pues con él era el único que tenía problemas allí[49].

### Agente Raymundo Quiles Moreno

El Agte. Quiles relató que el 9 de marzo de 2023, se personó a la Calle #20 del Barrio Piedra Aguza donde entrevistó al señor Hernández Ramos, el cual manifestó que él, su esposa e hijo, contaban con una orden de protección contra el apelante[50]. En cuanto a sus labores investigativas, expresó que:

> [p]ues tan pronto ambos entran a la residencia, pues yo procedo a ir donde el caballero Mario, lo llamé en varias ocasiones, este de primera instancia me indicó que estaba ocupado y que no iba a salir. Y yo le indiqué que tiene que salir porque yo tengo que entrevistarlo. Aquí hay una querella en su contra sobre una violación de una orden de protección, y yo tengo que hacer mi trabajo. Pues esto fue por una ventana delantera. Él procede a salir por la parte trasera de la residencia, por un portón que había, que está entre ambas, eh, frente a la verja de ambas casas, y caminó hacia el área de un portón que hay al frente, en la verja de al frente, y allí lo estaba entrevistando. Este me indicó, que yo le indiqué mire, este, caballero tiene una orden de protección, se está querellando en su contra y pues, usted tiene que lamentablemente salir para yo entrevistarlo y, y tomar una decisión de lo que voy a hacer con esto. Pues él indicó que no iba a salir. Y yo le dije que tiene que salir porque ahora mismo hay una querella y yo no me puedo ir sin resolver esta situación. Él indicaba que no tenía las llaves del portón, y que iba a entrar a buscarla. Él entra a buscar las llaves del portón y regresa. Abre y cuando sale afuera, pues yo le indiqué a él, ¿usted tiene conocimiento de una orden de protección que tiene el señor Alexis y su esposa, que viven aquí al lado suyo? Y él dijo que sí. Y le dije ¿usted tiene su copia, me la puede facilitar? Y él me dijo "yo no la encuentro, yo no sé dónde está, está por ahí, no se dónde esta." Y yo vine y le indiqué, pues mire... ¿que usted tiene que decir relacionado a lo que ocurrió esta mañana? Y él dijo "no es que me tienen cansado, ya ellos me tienen cansado" Y le dije pues entonces me tiene que acompañar al cuartel, por usted violar la orden 284, expedida por el Honorable Juez

---

44 Transcripción *Vista Celebradas*, pág. 146, líneas 20-25.
45 Transcripción *Vista Celebradas*, pág. 148, líneas 1-6.
46 Transcripción *Vista Celebradas*, pág. 148, líneas 10-14.
47 Transcripción *Vista Celebradas*, pág. 148, líneas 21-23.
48 Transcripción *Vista Celebradas*, pág. 148, líneas 24-31 y pág. 149, líneas 1-3.
49 Transcripción *Vista Celebradas*, pág. 149, líneas 4-6.
50 Transcripción *Vista Celebradas*, pág. 163, líneas 13-25.

Gini Vélez Carreras. Y procedía a leer las advertencias de ley y ponerlo bajo arresto. Lo puse bajo arresto y lo transporté hasta el cuartel de Juana Díaz[51].

Surge del testimonio del Agte. Quiles, que el apelante se negó a firmar unas advertencias de ley, sin embargo, el agente no lo hizo constar en ningún documento[52].

El testigo manifestó que él no gestionó el contenido de las cámaras ni tampoco verificó la data de las cámaras[53]. Lo que sí gestionó fue la recopilación de los videos y solamente vio un video[54].

Respecto a la procedencia de los videos, el Agte. Quiles admitió que no los investigó, pues no sabía cómo habían tomado esos videos y que tampoco tenía conocimiento de la fecha y la hora de estos[55].

Por su parte, la prueba documental de cargo consistió en lo siguiente: (1) Disco compacto (*Exhibit* 1), (2) Formulario de Consentimiento a un Registro (*Exhibit* 2), (3) Informe y Certificación de Evidencia Digital (*Exhibit* 3), (4) Orden de Protección al Amparo de la Ley Contra el Acecho en Puerto Rico (*Exhibit* 4, 5 y 6).

Luego de los testimonios presentados por el Ministerio Público y evaluada la totalidad de la prueba que tuvo ante sí, el 6 de octubre de 2023, el TPI emitió un veredicto de culpabilidad por el cargo, según imputado[56].

Así las cosas, el 5 de diciembre de 2023, el TPI emitió una Sentencia y dictaminó que:

(…)

Que habiendo sido el acusado de epígrafe juzgado debidamente por Tribunal de Derecho y declarado convicto del delito de **INFRACCIÓN ARTÍCULO 4 B LEY 284**, el Tribunal en cumplimiento de su fallo del 6 de octubre de 2023 debe condenar y condena a dicho acusado a la pena de ***TRES (3) AÑOS DE CÁRCEL. SE EXIME DEL PAGO DE ARANCEL ESPECIAL DE LA***

---

[51] Transcripción *Vista Celebradas*, pág. 164, líneas 27-21 y pág. 165, líneas 1-24.
[52] Transcripción *Vista Celebradas*, pág. 174, líneas 1-7.
[53] Transcripción *Vista Celebradas*, pág. 175, líneas 16-20.
[54] Transcripción *Vista Celebradas*, pág. 175, líneas 21-23.
[55] Transcripción *Vista Celebradas*, pág. 175, líneas 27-31 y pág 176, línea 1.
[56] Véase los autos originales, *Minuta* del 6 de octubre de 2023.

***LEY 183. ABÓNESE PREVENTIVA, SI ALGUNA***[57].
(Énfasis suplido).

(...)

Inconforme, el 28 de diciembre de 2023, el apelante acudió a este foro intermedio mediante recurso de *Apelación* y señaló la comisión de los siguientes errores:

A. Erró el Tribunal de Primera Instancia al declarar culpable al apelante sin que se haya demostrado más allá de duda razonable todos los elementos del delito imputado.

B. Erró el [T]ribunal de [P]rimera [I]nstancia al declarar culpable al apelante a base del testimonio del joven Alexis José Hernández Muñoz. Ello, sin tomar en consideración la evidencia ilustrativa-demostrativa presentada por el propio Ministerio Público la cual refleja serias incongruencias y refuta lo declarado por el Sr. Alexis José Hernández Muñoz con respecto a los alegados hechos del 3 de marzo de 2023.

C. Erró el [T]ribunal de [P]rimera [I]nstancia al imponer una Sentencia de tres (3) años de cárcel al aquí apelante cuando de la prueba desfilada no surge circunstancia alguna de las incluidas en el Art. 4(B) de la Ley Núm. 284-1999, según enmendada, que pueda constituir delito grave. Esto anterior, ya que no se probó el concepto de acecho -conforme lo define la Ley Núm. 284-1999- y, tampoco, se estableció historial previo alguna sobre un incumplimiento con la mencionada ley.

Por su lado, el 11 de junio de 2025, el Pueblo de Puerto Rico, representado por la Oficina del Procurador General (Pueblo o apelado) presentó su alegato en oposición al recurso ante nuestra consideración.

Con el beneficio de la comparecencia de ambas partes y los autos originales, damos por perfeccionado el recurso de *Apelación* y procedemos a resolver.

## II.

### -A-

La Ley Núm. 284-1999, *supra,* fue aprobada con el propósito de "proteger debidamente a personas que son víctimas de acecho, evitando posibles daños a su persona, sus bienes o a miembros de su familia"[58]. Dicho estatuto define el acecho como:

---

[57] Véase los autos originales, *Sentencia* dictada el 5 de diciembre de 2023.
[58] 33 LPRA sec. 4013 nota.

[...] una conducta mediante la cual se ejerce una vigilancia sobre determinada persona; se envían comunicaciones verbales o escritas no deseadas a una determinada persona, se realizan amenazas escritas, verbales o implícitas a determinada persona, se efectúan actos de vandalismo dirigidos a determinada persona, se hostiga repetidamente mediante palabras, gestos o acciones dirigidas a intimidar, amenazar o perseguir a la víctima o a miembros de su familia[59].

Pertinente a la controversia que nos ocupa, el Artículo 4 de la Ley Núm. 284-1999, *supra*, dispone lo siguiente:

(a) Toda persona que intencionalmente manifieste un patrón constante o repetitivo de conducta de acecho dirigido a intimidar a una determinada persona a los efectos de que ella, o cualquier miembro de su familia podría sufrir daños, en su persona o en sus bienes; o que mantenga dicho patrón de conducta a sabiendas de que determinada persona razonablemente podría sentirse intimidada incurrirá en delito menos grave.

El Tribunal podrá imponer la pena de restitución, además de la pena de reclusión establecida.

(b) Se incurrirá en delito grave y se impondrá pena de reclusión por un término fijo de tres (3) años si se incurriere en acecho, según tipificado en esta Ley, mediando una o más de las circunstancias siguientes:

(1) Se penetrare en la morada, o en el lugar de empleo, de determinada persona o de cualquier miembro de su familia, infundiendo temor de sufrir daño físico o ejercer presión moral sobre el ánimo de esta para llevar a cabo un acto contrario a su voluntad; o

(2) se infringiere grave daño corporal a determinada persona o miembro de su familia; o

(3) se cometiere con arma mortífera en circunstancias que no revistiesen la intención de matar o mutilar; o

**(4) se cometiere luego de mediar una orden de protección contra el ofensor, expedida en auxilio de la víctima del acecho o de otra persona también acechada por el ofensor; o**

(5) se cometiere un acto de vandalismo que destruya propiedad en los lugares inmediatos o relativamente cercanos al hogar, residencia, escuela, trabajo o vehículo de determinada persona o miembro de su familia; o

(6) se cometiere por una persona adulta contra un o una menor, o

(7) se cometiere contra una mujer embarazada.

(8) Se cometiere contra una persona con la que se sostiene una relación afectiva o intrafamiliar de convivencia domiciliaria en la que no haya existido una relación de pareja, según definida por la Ley Núm. 54 del 15 de agosto de 1989, según enmendada.

---

[59] 33 LPRA sec. 4013.

> El tribunal podrá imponer la pena de restitución, además de la pena de reclusión establecida. El proceso y castigo de cualquier persona por el delito definido y castigado en esta Ley no impedirá el proceso y castigo de la misma persona por cualquier otro acto u omisión en violación de cualquiera de las demás disposiciones de esta Ley o de cualquier otra ley[60]. (Énfasis nuestro).

Por su parte, el Artículo 10 de la Ley Núm. 284-199, sobre incumplimiento de órdenes de protección, establece que:

> Cualquier violación a sabiendas de una orden de protección, expedida de conformidad con esta Ley, será castigada como delito menos grave; esto sin menoscabar su responsabilidad criminal bajo el Artículo 4 (b)(1) de esta Ley o cualquier otra ley penal y constituirá desacato al Tribunal, lo que podría resultar en pena de cárcel, multa o ambas penas. No obstante lo dispuesto por la Regla 11 de las Reglas de Procedimiento Criminal, según enmendada, Ap. II del Título 34, aunque no mediare una orden a esos efectos todo oficial del orden público deberá efectuar un arresto, si se le presenta una orden de protección expedida al amparo de esta Ley o de una ley similar contra la persona a ser arrestada, o si determina que existe dicha orden mediante comunicación con las autoridades pertinentes y tiene motivos fundados para creer que se han violado las disposiciones de la misma[61].

**-B-**

La Constitución de Puerto Rico garantiza a toda persona acusada de delito el derecho fundamental a la presunción de inocencia[62]. Igualmente, la Regla 304 de las Reglas de Evidencia incorpora la mencionada presunción[63]. Asimismo, la Regla 110 Procedimiento Criminal[64], reitera el precitado derecho fundamental: "[e]n todo proceso criminal, se presumirá inocente al acusado mientras no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, se le absolverá. [...]". A su vez, dicha norma constituye uno de los imperativos del debido proceso de ley al exigir que una persona acusada en un proceso criminal se presuma inocente, mientras no se demuestre lo contrario[65]. Ahora bien, para rebatir tal presunción, nuestro ordenamiento requiere

---

[60] 33 LPRA sec. 4014.
[61] 33 LPRA sec. 4020.
[62] Art. II, Sec. 11, Const. ELA, LPRA, Tomo 1. *Pueblo v. Santiago*, 176 DPR 133, 142 (2009).
[63] 32 LPRA Ap. VI, R. 304 (1).
[64] 34 LPRA Ap. II, R. 110.
[65] *Pueblo v. Irizarry*, 156 DPR 780, 786 (2002).

que el Estado establezca la culpabilidad una persona imputada de delito más allá de duda razonable[66]. Es decir, se exige un quantum probatorio de más allá de duda razonable para controvertir la presunción de inocencia[67].

En cuanto al concepto de "duda razonable" el mismo implica una insatisfacción o intranquilidad en la conciencia del juzgador respecto a la evidencia presentada en el caso[68]. Sobre este particular, nuestro Máximo Foro ha expresado que:

> El Ministerio Fiscal no cumple con ese requisito presentando prueba que meramente sea "suficiente", esto es, que "verse" sobre todos los elementos del delito imputado; se le requiere que la misma sea "suficiente en derecho". Ello significa que la evidencia presentada, "además de suficiente, tiene que ser satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación" o en un ánimo no prevenido [...] Esa "insatisfacción" con la prueba es lo que se conoce como "duda razonable y fundada"[69].

Por consiguiente, el *quantum* de más allá de duda razonable aplica para "cada uno de los elementos del delito, la conexión de estos con el acusado y la intención o negligencia de éste"[70].

### -C-

La apreciación de la prueba que realiza el Tribunal de Primera Instancia en el ejercicio de su sana discreción está revestida de confiabilidad y merece nuestro respeto y deferencia[71]. Es por ello que, la valoración que realiza el foro primario se presume correcta, toda vez que es este quien tiene la oportunidad de ver, escuchar y valorar las declaraciones de los testigos, así como sus lenguajes no verbales[72].

Nuestro más Alto Foro ha resuelto que un tribunal revisor no debe sustituir su criterio por el del foro de instancia, salvo cuando

---

[66] *Pueblo v. Arlequín Vélez*, 204 DPR 117, 146 (2020).
[67] *Pueblo v. Santiago, supra*, pág. 142.
[68] *Pueblo v. Irizarry, supra*, pág. 788.
[69] *Pueblo v. De Jesús Mercado*, 188 DPR 467, 476 (2013) citando a *Pueblo v. Cabán Torres*, 177 DPR 645 (1986).
[70] *Pueblo v. Santiago, supra*, pág. 142.
[71] *Argüello v. Argüello*, 155 DPR 62, 79 (2001) citando a *Pueblo v. Bonilla Romero*, 120 DPR 92, 111 (1987).
[72] *Pueblo v. Santiago, supra*, pág. 148.

estén presentes circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto[73].

Por ende, este foro intermedio apelativo no debe intervenir con las determinaciones de hechos, con la apreciación de la prueba ni con la adjudicación de credibilidad efectuadas por el mismo, excepto en aquellas situaciones en que se demuestre que este último: (i) actuó con prejuicio o parcialidad, (ii) incurrió en un craso abuso de discreción, o (iii) se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo[74]. Asimismo, se podrá intervenir con la determinación del foro primario cuando la referida valoración se aparte de la realidad fáctica o resulte inherentemente imposible o increíble[75]. De modo que, este tribunal revisor solo podrá intervenir con la apreciación del foro juzgador si, luego de evaluar minuciosamente la prueba del caso, guardamos serias, razonables y fundadas dudas acerca de la culpabilidad del acusado[76].

**-D-**

En el ámbito del derecho probatorio nuestro ordenamiento establece que, para ser admisible toda evidencia, además de pertinente, debe ser autenticada. Así, para que una evidencia sea admitida, la parte proponente viene obligada a efectuar su autenticación[77]. Por su parte, la Regla 901 de Evidencia[78] contiene una lista, no taxativa, de métodos para autenticar la evidencia, "por lo que la autenticación no tiene que realizarse mediante un método específico"[79]. A tales efectos, la Regla 901 (A) de Evidencia[80] dispone que "[e]l requisito de autenticación o identificación como una

---

[73] *Coop. Seguros Múltiples de P.R. v. Lugo*, 136 DPR 203, 208 (1994).
[74] *Pueblo v. Irizarry, supra*, pág. 789.
[75] *Pueblo v. Martínez Landrón*, 202 DPR 409, 424 (2019) citando a *Pueblo v. Maisonave*, 129 DPR 49, 62-63 (1991).
[76] *Pueblo v. Casillas, Torres*, 190 DPR 398, 415-417 (2014).
[77] *Pueblo v. Bianchi Álvarez*, 117 DPR 484 (1986).
[78] 32 LPRA Ap. VI, R.901.
[79] *Rosado Reyes v. Global Healthcare*, 205 DPR 796, 813 (2020).
[80] 32 LPRA Ap. VI, R.901 (A).

condición previa a la admisibilidad se satisface con la presentación de evidencia suficiente para sostener una determinación de que la materia en cuestión es lo que la persona proponente sostiene". Es decir, autenticar una pieza de evidencia es probar que la misma es lo que su proponente alega que es[81].

Así pues, para satisfacer el requisito básico de autenticación, nuestro ordenamiento legal identifica, en el inciso (B) de la Regla 901 de Evidencia[82], a modo de ejemplo, varias formas de autenticar. Estos medios son suficientes, pero no necesarios para autenticar la evidencia[83]. En lo aquí concerniente, la Regla 901 (B) de Evidencia dispone que:

> b) De conformidad con los requisitos del inciso (A) de esta regla y sin que se interprete como una limitación, son ejemplos de autenticación o identificación los siguientes:
>
> (1) Testimonio por testigo con conocimiento.
> Testimonio de que una cosa es lo que se alega.
>
> (...)
>
> (12) Proceso o sistema. — Evidencia que describa el proceso o sistema utilizado para obtener un resultado y que demuestre que el proceso o sistema produce resultados certeros.
>
> (13) Récord electrónico. — Un récord electrónico podrá autenticarse mediante evidencia de la integridad del sistema en el cual o por el cual los datos fueron grabados o almacenados. La integridad del sistema se demuestra a través de evidencia que sustente la determinación que en todo momento pertinente el sistema de computadoras o dispositivo similar estaba operando correctamente o en caso contrario, el hecho de que su no operación correcta no afectó la integridad del récord electrónico[84].
> (...)

Por su parte, en los casos en que se trata de evidencia electrónica, la misma comprende "aquella información que es creada, almacenada o compartida a través de un dispositivo o sistema electrónico"[85]. Asimismo, se ha reconocido que es "cualquier tipo de prueba que esté almacenada en un medio o sistema

---

[81] *Rosado Reyes v. Global Healthcare*, *supra*, pág. 812.
[82] 32 LPRA Ap. VI, R.901 (B).
[83] E. L. Chiesa Aponte, *Reglas de Evidencia Comentadas*, Ed. SITUM, 2016, pág. 347.
[84] 32 LPRA Ap. VI, R.901 (B).
[85] *Rosado Reyes v. Global Healthcare*, *supra*, pág. 811.

electrónico o que sea el resultado de un proceso o sistema electrónico"[86]. Para autenticar una pieza de evidencia electrónica, puede hacer falta el testimonio pericial, no obstante, cuando se trata de tecnología cuyo uso se ha generalizado y está accesible a los legos –como por ejemplo, archivos de computadora, mensajes de texto, correos electrónicos- no es necesario el testimonio pericial para autenticar dicha pieza[87]. Sobre ese particular, nuestro Máximo Foro ha resuelto que la evidencia electrónica se podrá autenticar mediante los mecanismos comunes utilizados en los litigios, a saber: (1) autenticación mediante características distintivas y (2) autenticación mediante el testimonio de un testigo con conocimiento[88].

Específicamente sobre la autenticación de la prueba electrónica, Emmanuelli resume lo siguiente:

> [...] a pesar de todas las contingencias que pueden incidir en la integridad y confiabilidad de la prueba electrónica, una cosa es su autenticación, que requiere solo evidencia suficiente para sostener que el asunto en cuestión es lo que el proponente sostiene, y otra cosa es el valor probatorio de la evidencia. Una vez satisfecho el criterio de autenticación y no existiendo regla de exclusión como prueba de referencia o privilegios, la evidencia electrónica se puede admitir. Cualquier duda sobre el origen, contenido o manipulación posterior de dicha prueba electrónica podría ir dirigida al proceso de estimación del valor probatorio. (Énfasis nuestro)[89].

### III.

En el caso de autos, el apelante señaló la comisión de tres errores y, por estar íntimamente relacionados entre sí, discutiremos los mismos de forma conjunta. En síntesis, el señor Ortiz adujo que el TPI erró al declararlo culpable por infringir el Artículo 4 (b) de la Ley Núm. 284-1999, *supra*: (1) sin que se haya demostrado más allá de duda razonable todos los elementos del delito imputado; (2) sin tomar en consideración la evidencia ilustrativa-demostrativa

---

[86] R. Emmanuelli Jiménez, *Prontuario de Derecho Probatorio Puertorriqueño*, Ed. SITUM, 2016, pág. 563.
[87] *Íd.*, pág. 565. *Rosado Reyes v. Global Healthcare, supra*, págs. 813-814.
[88] *Íd.*, págs. 814.
[89] R. Emmanuelli Jiménez, *supra*, pág. 566.

presentada por el propio Ministerio Público la cual reflejaba serias incongruencias en lo declarado por el Sr. Alexis José Hernández Muñoz con respecto a los alegados hechos del 3 de marzo de 2023 y, (3) al imponerle una Sentencia de tres (3) años de cárcel cuando de la prueba desfilada no surgió circunstancia alguna de las incluidas en el Artículo 4 (b) de la Ley Núm. 284-1999, *supra*, que pueda constituir delito grave, pues no se probó el concepto de acecho -conforme lo define el estatuto- y, tampoco, se estableció historial previo alguno sobre un incumplimiento con la mencionada ley.

Como adelantamos en la exposición del derecho, el Artículo 4 de la Ley Núm. 284-1999, *supra*, dispone lo siguiente:

> (a) Toda persona que intencionalmente **manifieste un patrón constante o repetitivo de conducta de acecho dirigido a intimidar a una determinada persona** a los efectos de que ella, o cualquier miembro de su familia podría sufrir daños, en su persona o en sus bienes; o que mantenga dicho patrón de conducta a sabiendas de que determinada persona razonablemente podría sentirse intimidada incurrirá en delito menos grave.
>
> El Tribunal podrá imponer la pena de restitución, además de la pena de reclusión establecida.
>
> (b) **Se incurrirá en delito grave y se impondrá pena de reclusión por un término fijo de tres (3) años si se incurriere en acecho**, según tipificado en esta Ley, mediando una o más de las circunstancias siguientes:
>
> (...)
>
> **(4) se cometiere luego de mediar una orden de protección contra el ofensor, expedida en auxilio de la víctima del acecho o de otra persona también acechada por el ofensor;** [90]. (Énfasis nuestro).
>
> (...)

Se desprende del tracto procesal que, el Ministerio Público le imputó al apelante la violación al Artículo 4 (b) de la Ley Núm. 284-1999, *supra*, pues alegadamente el mismo violó la orden de acecho número: POL2842022-01902 expedida a favor del señor Hernández Muñoz. Esto, debido a que el señor Ortiz incurrió en un presunto patrón de palabras soeces contra el señor Hernández Muñoz.

---

[90] 33 LPRA sec. 4014.

Ahora bien, para probar que se cometió el delito imputado, el Ministerio Público tenía que constatar el patrón que exige el estatuto precitado. Somos de la opinión que, el Ministerio Público no logró probar los elementos del delito tipificado en el Artículo 4 (b) de la Ley 284-1999, *supra*, por ende, entendemos que el TPI erró al encontrar culpable al señor Ortiz. Veamos.

En primera instancia, tanto la *Denuncia* como la *Acusación* hicieron referencias a distintas fechas en las cuales el apelante profirió palabras soeces, entiéndase, el 23 de febrero de 2023, 24 de febrero de 2023, 3 de marzo de 2023, 4 de marzo de 2023 y 9 de marzo de 2023. No obstante, durante el juicio en su fondo no se presentaron videos del 23 y 24 de febrero de 2023 ni del 4 de marzo de 2023. Por lo que no se presentó video alguno de lo alegado por el señor Hernández Muñoz que, estando dentro de su residencia el 23 de febrero de 2023, observó al apelante a través de las cámaras dirigirse a su padre, el señor Hernández Ramos. Igualmente, al no haber video del 24 de febrero de 2023 y del 4 de marzo de 2023, no se pudo constatar que el señor Ortiz estaba verja con verja profiriendo palabras soeces, según lo testificado por el señor Hernández Muñoz.

Por otra parte, y más importante, los videos de las fechas del 3 y 9 de marzo de 2023, entendemos que no eran admisibles en evidencia, debido a que no se autenticaron conforme a lo establecido por nuestro ordenamiento. Como mencionamos en la exposición del derecho, para autenticar una pieza de evidencia electrónica, puede hacer falta el testimonio pericial. No obstante, cuando se trata de tecnología cuyo uso se ha generalizado y está accesible a los legos – como por ejemplo, archivos de computadora, mensajes de texto, correos electrónicos- no es necesario el testimonio pericial para

autenticar dicha pieza[91]. Sobre ese particular, nuestro Máximo Foro ha resuelto que la evidencia electrónica se podrá autenticar mediante los mecanismos comunes utilizados en los litigios, a saber: (1) autenticación mediante características distintivas y (2) autenticación mediante el testimonio de un testigo con conocimiento[92].

Tomando lo antes mencionado como punto de partida, concluimos que ninguno de los testigos con conocimiento, es decir, el señor Hernández Muñoz, el Agte. Alonso y el Agte. Quiles, pudieron cumplir con la Regla 901 (B) de Evidencia, *supra*, para poder autenticar los videos que estaban supuestos a probar el patrón de acecho del apelante.

Si bien el señor Hernández Muñoz explicó como extrajo los videos de las cámaras, a nuestro juicio, no pudo cumplir con el principio de mismidad -establecer que lo que se propone es lo que es[93]- si el contenido de los videos no fue alterado, por consiguiente, el contenido de estos no se autenticó de manera adecuada. Por su parte, el Agte. Alonso admitió en su testimonio que: (1) su función se limitó a extraer los videos del celular del señor Hernández Muñoz; (2) no verificó las cámaras de seguridad ni hizo una extracción directa de los videos, pues el señor Hernández Muñoz no proveyó las mismas para verificarlas; (3) desconocía si los videos estaban en su totalidad o si fueron alterados debido a que nunca revisó las cámaras de seguridad y (4) no sabía la fecha ni la hora en la cual se tomaron los videos. Por su parte, el Agte. Quiles admitió que no realizó gestión alguna para verificar la data de las cámaras de seguridad y tampoco investigó la procedencia, fecha y hora de los

---

[91] R. Emmanuelli Jiménez, *Prontuario de Derecho Probatorio Puertorriqueño, supra*, pág. 565. *Rosado Reyes v. Global Healthcare, supra*, págs. 813-814.
[92] *Rosado Reyes v. Global Healthcare, supra*, págs. 814.
[93] Ernesto Luis Chiesa Aponte (2016). *Reglas de Evidencia Comentadas* 345; Vivian I. Neptune Rivera. (2017). *La Evidencia Electrónica: Autenticación y Admisibilidad 10.*

videos. En conclusión, el Ministerio Público no probó que no se les realizaron cambios a los videos y que los mismos reflejaban la totalidad de los hechos ocurridos.

Ahora bien, aun partiendo de que los videos fueran admisibles en evidencia, luego de evaluar la prueba ante nos, concluimos que no se demostró que las mismas se hicieran contra el señor Hernández Muñoz con posterioridad a la expedición de la orden de protección. Es menester puntualizar que, el señor Hernández Muñoz, la señora Muñoz y el señor Hernández Ramos en sus testimonios no pudieron probar que el apelante, al proferir las palabras soeces, se refería personalmente a ellos, pues el señor Ortiz nunca mencionó nombres en específico.

En fin, el Ministerio Público tenía la obligación de presentar prueba de todos los elementos del delito tipificado en el Artículo 4 (b) de la Ley 284-1999, *supra.* Es decir, tenía que probar que luego de expedida una orden de protección, se incurrió en un patrón repetitivo de conducta de acecho consistente en dos o más actos, con el propósito de intimidar. En el caso de marras, no se demostró más allá de duda razonable que el señor Ortiz después de expedida la orden de acecho POL2842022-01902, la haya violado y menos aún, que existía un patrón de conducta repetitiva de acecho contra el señor Hernández Muñoz y su familia.

**IV.**

Por los fundamentos que anteceden, los cuales hacemos formar parte de este dictamen, se ***revoca*** la *Sentencia* apelada.

Notifíquese.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones. La Juez Lebrón Nieves disiente sin voto escrito.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones